# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TASHA GREEN CRUZAT,

    Plaintiff,                                Case No. 21-cv-05643

v.

YWCA METROPOLITAN CHICAGO,

    Defendant.

## COMPLAINT

Plaintiff TASHA GREEN CRUZAT ("Plaintiff"), by and through her attorneys, alleges the following against Defendant YWCA METROPOLITAN CHICAGO ("Defendant" or "YWCA").

## INTRODUCTION

1.      This is an action for race discrimination pursuant to the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981"), and retaliation pursuant to the Illinois Whistleblower Act, 740 ILCS 174/20 ("IWA").

## JURISDICTION AND VENUE

2.      Jurisdiction is based on 28 U.S.C. §1331 and 1343, and principles of pendant and supplemental jurisdiction under 28 U.S.C. §1367.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because the unlawful employment practices alleged in this Complaint occurred in the Northern District of Illinois.

## THE PARTIES

4.      Plaintiff, a resident of Porter County, Indiana, is an African-American woman who was employed by Defendant from December 16, 2019 until her termination on May 27, 2021.

5.      Defendant is a not-for-profit Illinois corporation headquartered in Chicago that runs community-based programs throughout the Chicagoland area.  It receives millions of dollars in annual funding from various federal, state, and private granting organizations.

## FACTUAL ALLEGATIONS

### Employment History

6.      Plaintiff is a business and public policy professional with over a twenty-year track record of leading government and non-profit institutions focused on child advocacy and racial justice. She holds both an MBA and will obtain her doctorate degree in education this fall.  Plaintiff was hired in 2016 to serve as the President of Voices for Illinois Children ("Voices"), a non-profit organization with the stated mission of "champion[ing] strong public policies and investments for all children in our state." https://www.voices4kids.org/about-us/mission-history/.

7.      Plaintiff successfully led Voices for 4 years, but due to a dearth of funding, she and the Voices Board of Directors accepted the YWCA's overture to acquire Voices in late 2019. Both the YWCA and Voices considered this acquisition a win-win as it would bolster the YWCA's reputation and stated mission of advocating for women, and significantly increase Voices' reach and fundraising opportunities.

8.      The acquisition agreement provided that the Voices brand would continue to exist as a sub-organization within the YWCA and that the YWCA would assume Voices' debt and cover its existing budget shortfalls. The YWCA also agreed to retain Plaintiff as Voices' Executive Director and to allow her to continue to manage the work previously done by Voices with a degree of autonomy and an independent voice – both of which were important to Voices' main funders, the Annie E. Casey Foundation and Partnership for America's Children.

9.      In accordance with the acquisition agreement, Plaintiff, along with two of her staff members, became employees of the YWCA on December 16, 2019, reporting to Shelley

Bromberek-Lambert (white), the YWCA's current Interim CEO who at the time was Chief Reimagination Officer and oversaw all early childhood and youth services programs at the YWCA.

10.     No objection was raised about the salaries offered to Plaintiff or her staff at the time of the acquisition. Indeed, Ms. Bromberek-Lambert promised raises for each of them in the coming months.

**The YWCA's Failure to Promote and Evidence of Racial Animus**

11.     From the beginning of Plaintiff's employment, it became apparent to her that Ms. Bromberek-Lambert was not going to be the supportive partner she had hoped for. Contrary to the spirit of the Voices acquisition which was intended to allow Plaintiff to continue the work of that mission with an independent voice, Ms. Bromberek-Lambert kept her on a tight leash, requiring her to seek approval for many decisions and discouraging her from sharing ideas.

12.     Worse, Ms. Bromberek-Lambert did nothing to assist with fundraising, despite it being a condition of the acquisition agreement. The WYCA had a dedicated branch for fundraising for all programs the YWCA, including Voices, led by Molly Silverman (white), Chief Strategic Engagement Officer. Plaintiff sought fundraising assistance on several occasions from Ms. Silverman but received little support, and although Ms. Bromberek-Lambert was aware of the issue she did nothing to intervene or to hold Ms. Silverman accountable.

13.     In addition to disregarding the spirit of the acquisition agreement, Ms. Bromberek-Lambert also overloaded Plaintiff with work without appropriate compensation or recognition. The raise she was promised upon joining the YWCA never came to fruition despite increased responsibilities from her role at Voices.

14.     Furthermore, when the YWCA's Chief Impact Officer in charge of public policy left the organization in August 2020, Ms. Bromberek-Lambert added those responsibilities to

Plaintiff's, essentially doubling her workload. However, when Ms. Plaintiff asked for a salary adjustment and elevated job title to reflect the expanded scope of her work, Ms. Bromberek-Lambert flat out refused, claiming that she had done Plaintiff "a favor" by retaining her with the Voices' acquisition and that she was lucky the YWCA "even brought [her] over."

15.     This decision seemed to be purely out of spite, as the YWCA had sufficient funding to increase Plaintiff's salary, and Ms. Bromberek-Lambert had approved multiple raises and title changes for white employees under her purview around this time. For example, Marianne Pokorny (white) was promoted from Senior Manager to Director of Civic Engagement with much fanfare within the organization to recognize her new role. Similarly, Danette Connors (white), Vice President of Early Childhood Services, Peggy McGuire (white), Director of Child and Family Development, and even Ms. Bromberek-Lambert herself had also been given sizable raises in recent months.

16.     Despite these obstacles to success, Plaintiff was able to secure substantial additional funding for Voices, including a $250,000 grant from America's Children, the largest ever from that donor, $100,000 from the Annie E. Casey Foundation and other grants projected. She also won a major legislative victory for both Voices and the YWCA in April 2021 with the passage of the Racial Impact Note Act, a broad and impactful piece of legislation that Plaintiff and her team had been lobbying for on behalf of Illinois children for years. Yet, in a further marginalization of her contributions, Ms. Bromberek-Lambert ignored this huge achievement and did nothing to promote it either internally or externally for fundraising purposes.

17.     Ms. Bromberek-Lambert's mistreatment of Plaintiff reached new heights on April 15, 2021 when she condemned Plaintiff for issuing a statement in her role as Executive Director

of Voices reaffirming Voices' commitment to ensuring the safety of all Illinois children following the murder of Adam Toledo, a 13-year-old Latino boy, by the Chicago Police.

18. Plaintiff was taken aback by Ms. Bromberek-Lambert's criticism given that she had routinely made public statements in her role with Voices and had never been previously told that such statements must be approved by Ms. Bromberek-Lambert or anyone else at the YWCA. The statement was picked up by several publications, and the next morning Ms. Bromberek-Lambert called Plaintiff enraged, accusing her of being "conniving" and "backhanded" and of having "backstabbed" her. Ms. Bromberek-Lambert also called Adam Toledo a "gang banger" and implied that his death did not matter and was not worth speaking out about.

19. Plaintiff was shocked by Ms. Bromberek-Lambert's blatantly racist language and responded that, even if Adam Toledo was not the perfect victim, she still had a duty to speak out given her role as an advocate for all Illinois children. Ms. Bromberek-Lambert was not persuaded, however, and on April 19, she placed a write-up in Plaintiff's file admonishing her for "[l]ack of Collaboration, Coordination [sic] and follow through on process" regarding the statement, even though no "process" had ever previously been communicated to Plaintiff.

**Plaintiff's Refusal to Engage in Prohibited Lobbying Activities**

20. In Spring 2021, Ms. Bromberek-Lambert began asking Plaintiff to engage in unethical lobbying activities. The YWCA had recently invested in Open Staff, a company based in Texas that placed teachers and childcare professionals on demand when there were shortages. Because Open Staff is a for-profit company with no ties or relationship to the state of Illinois Department of Children and Family Services ("DCFS"), it was not eligible for the non-profit waiver of the $75 fee for background checks of individuals working with children. To get around this restriction, Ms. Bromberek-Lambert repeatedly solicited Plaintiff to lobby DCFS and the

5

Illinois legislature to create additional exceptions to the waiver so that the YWCA/Open Staff would be exempt from the background check fee, which the YWCA would profit from significantly.

21. As a long-time registered lobbyist, Plaintiff considered this to be unethical conduct and a violation of the Illinois Lobbyist Registration Act, 25 ILCS 170/. She warned against engaging in such activity because Open Staff is a for-profit company and its financial ties to the YWCA had not been disclosed and because she was not a registered agent for that company. In addition, because Plaintiff is a lobbyist, she is prohibited from communicating such requests and/or "favors" with state agencies. Specifically, Plaintiff was concerned that such actions would violate Section 5 of the Illinois Lobbyist Registration Act. 25 ILCS 170/5, which requires that any lobbyist lobbying on behalf of an entity in Illinois disclose her affiliation by registering with the Secretary of State before undertaking such activities.

22. Plaintiff clearly communicated to Ms. Bromberek-Lambert that she felt what she was being asked to do was illegal, but Ms. Bromberek-Lambert refused to engage with Plaintiff to discuss her concerns or identify a workable solution. Instead, Ms. Bromberek-Lambert continued to press the issue and ultimately tried to circumvent Plaintiff's concerns by pressuring one of her subordinates, Mitch Lifson, to engage in the same lobbying activities without Plaintiff's involvement.

23. In May 2021, Marianne Pokorny, on behalf of Ms. Bromberek-Lambert, also asked if Plaintiff or Mr. Lifson could talk to legislators about this issue. Just days before Plaintiff was abruptly terminated, Plaintiff told Ms. Pokorny, who was working with Ms. Bromberek-Lambert closely on this issue, "It's unethical and a conflict and neither Mitch nor I are going to go to jail

for this. Can we come up with another alternative?" No alternative was suggested, and within a few days Plaintiff was fired.

**Termination**

24.     On May 27, 2021, Plaintiff was completely blindsided when she was informed that she was being terminated effective immediately due to a claimed "position elimination" as part of a larger organizational restructuring. This explanation seemed dubious, as there had been no prior discussions of restructuring either Voices or the public policy arm of the organization. The only other employee terminated at the same time was also a woman of color reporting to Ms. Bromberek-Lambert.

25.     Contrary to the claim that Plaintiff's position had been "eliminated," her job responsibilities and direct reports were assumed by Katelyn Jones (white), an employee hired by Ms. Bromberek-Lambert and Ms. Silverman just a few months earlier who lacked Plaintiff's experience in public policy and advocacy. To add insult to injury, Ms. Jones also got an elevated title upon taking over Plaintiff's duties, which Plaintiff had been denied when she was forced to take on double the responsibilities.

26.     It can reasonably be inferred that Plaintiff's termination was at least partially in retaliation for her refusal to engage in unethical lobbying activities which she reasonably believed violated the Illinois Lobbyist Registration Act, 25 ILCS 170/5, especially considering that Mr. Lifson, Plaintiff's employee who had also refused to engage in unethical lobbying activities, was also punished by Ms. Bromberek-Lambert the very same day, presumably for the same reason. However, Mr. Lifson, who is white, was merely demoted for the same conduct that resulted in Plaintiff's termination.

27.     That such a highly regarded and accomplished leader would be terminated with no warning while white employees were getting promotions and raises was shocking to more than Plaintiff. At least two YWCA board members shared their concerns with Ms. Bromberek-Lambert and other board members following Plaintiff's termination, both noting that, not only was her termination directly contrary to the terms of the YWCA's acquisition of Voices, which stipulated that Plaintiff would be hired by the YWCA to continue Voices' mission, but it also smacked of racism.  As one board member wrote in an email to the YWCA Board of Directors and Executive Team:

> After years of working with members of the Illinois General Assembly, Voices achieved passage of a Racial Impact Note Act – a measure truly addressing the YWCA's core mission of achieving racial equity. Yet instead of embracing and celebrating the achievement, the YWCA has decided to fire Voices Executive Director Tasha Green Cruzat, an African-American woman, reorganize the staff, and place them under the supervision of a white woman. This doesn't send a message of equity. It sends the message that the YWCA decided to squash an effective and fierce advocate for children for all races and ethnicities.
>
> You have removed the Executive Director, who was the architect of a major legislative victory, in a manner very disruptive to Voices.   How must that look to our funders and stakeholders? The fact that the fired employee is female and a person of color is also very problematic.

28.     Both board members have since resigned from the YWCA Board and called for Voices to reestablish itself as an independent organization following the YWCA's conduct, which has undermined Voices' independence and mission.

29.     As a tacit admission that the "restructuring" claimed by the YWCA was not the real reason for Plaintiff's termination, Defendant subsequently shifted its explanation for Plaintiff's termination, claiming for the first time months later that her performance was deficient. Defendant has also claimed at that time that the YWCA did not have sufficient funding to pay Plaintiff's salary, despite the fact that the YWCA had explicitly agreed to cover budget shortfalls in the

acquisition agreement and that Plaintiff had secured substantial additional funding for Voices in the coming year in addition to a $9 million dollar unrestricted grant awarded to the YWCA in 2021 to be distributed across the organization. Neither of these recently offered reasons was ever raised prior to Plaintiff's termination.

**Pattern and Practice of Race Discrimination**

30.    Ms. Bromberek-Lambert, acting as an agent of the YWCA, has a pattern of discriminating against African-American women, specifically, by luring them into positions of leadership with the promise of independence and then systematically silencing their voices and ultimately terminating them when they seek to assert that independence and replacing them with white employees.

31.    At least three African-American women who reported directly to Ms. Bromberek-Lambert around the same time frame were terminated or forced to resign based on the same vague reasons given to Plaintiff – thinly veiled retaliation for daring to challenge Ms. Bromberek-Lambert. White employees who voice their opinions and act independently, by contrast, are embraced and often promoted to assume the job duties of the black women Ms. Bromberek-Lambert has gotten rid of.

32.    Indeed, of the five African-American women reporting directly to Ms. Bromberek-Lambert in the last several years, all but one were terminated or forced to resign after a short time.

33.    Thus, while Ms. Bromberek-Lambert may have created the impression that she is engaged in diverse hiring practices, in reality she has fostered a work environment so hostile to black employees that it has become a revolving door for diverse employees who are not allowed to thrive under her leadership.

## COUNT I

### RACE DISCRIMINATION
### IN VIOLATION OF SECTION 1981
### (42 U.S.C. §1981)

34.     Plaintiff realleges and incorporates by reference the allegations set forth above as though fully stated herein.

35.      Section 1981 prohibits an employer from discriminating against an employee on the basis of race.  42 U.S.C. §1981.

36.     Defendant discriminated against Plaintiff on the basis of her race in violation of Section 1981 by failing to fairly compensate and promote her while giving raises to and promoting her white peers and by terminating Plaintiff and replacing her with a less experienced white employee.

37.     As a result of Defendant's unlawful conduct, Plaintiff has suffered pecuniary and emotional damages.

38.     Defendant engaged in the discriminatory conduct described herein with malice or reckless indifference to Plaintiff 's federally protected rights.

### COUNT II

### RETALIATORY DISCHARGE
### IN VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT
### (740 ILCS 174/1 et seq.)

39.     Plaintiff realleges and incorporates by reference the allegations set forth above as though fully stated herein.

40.     The Illinois Whistleblower Act, 740 ILCS 174/1 et seq. ("the IWA"), prohibits an employer from retaliating against an employee "for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20.

41.     Defendant terminated Plaintiff's employment on May 27, 2021 in retaliation for her refusal to engage in unethical lobbying activities that she reasonably believed would have violated the Section 5 of the Illinois Lobbyist Registration Act, specifically, lobbying on behalf of a company, Open Staff, without registering and fully disclosing the YWCA's financial ties to the company in violation of 25 ILCS 170/5.

42.     Defendant's termination of Plaintiff for refusing to engage in illegal lobbying activities violates Section 20 of the Illinois Whistleblower Act. 740 ILCS 174/20.

43.     As a result of Defendant's violation of the Illinois Whistleblower Act, Plaintiff has suffered damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.      Enter a judgment that the conduct of the Defendant alleged herein violates the laws of the United States and the State of Illinois;

B.      Award Plaintiff all back pay, front pay, benefits, pre-judgment interest, and any other remuneration to which she would have been entitled but for Defendant's unlawful conduct;

C.      Award Plaintiff compensatory and punitive damages;

D.      Award Plaintiff the costs of this action, including reasonable attorneys' fees, expert fees, and any other costs reasonably incurred in the litigation of this matter;

E.      Award Plaintiff such other and further equitable, injunctive and legal relief as this Court finds necessary and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,

TASHA GREEN CRUZAT

By     *s/Brenda H. Feis*
            One of Her Attorneys

Brenda H. Feis
Elisabeth G. Mustoe
FEIS GOLDY LLC
161 N. Clark Street
Suite 1600
Chicago, IL 60601
(312) 523-2200
bfeis@feisgoldy.com
emustoe@feisgoldy.com

October 22, 2021

12